# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH

| | |
|---|---|
| Skatteforvaltningen,<br><br>     Plaintiff,<br><br>  vs.<br><br>Luke McGee, 470 South Ocean Boulevard Trust and Jonathan E. Gopman, *in his capacity as trustee for the 470 South Ocean Boulevard Trust*, and John Does 1 through 100,<br><br>     Defendants. | Civil Action No. |

Plaintiff Skatteforvaltningen ("SKAT"), by its undersigned counsel, alleges against Defendants Luke McGee ("McGee"), 470 South Ocean Boulevard Trust ("470 Trust"), Jonathan E. Gopman, in his capacity as trustee for the 470 Trust ("Gopman"), and John Does 1 through 100 as follows:

1. Starting in or around 2012 and through at least 2021, Defendant Luke McGee perpetrated three distinct, multi-million-dollar frauds – a sophisticated dividend withholding tax refund fraud on the Danish government, a similar dividend withholding tax refund fraud on the Belgian government, and a securities fraud on individuals who invested their money into a publicly-traded company, AdaptHealth Corp. ("AdaptHealth") while serving as that company's Chief Executive Officer – the results of which lined his pockets with tens of millions of dollars of fraudulent proceeds.

2. When his fraud on the Danish government unraveled, McGee postured as if he would repay the money he stole in order to avoid a publicly filed lawsuit accusing him of wrongdoing.  He, along with his co-conspirators, agreed to pay their net proceeds gained from

the fraud back to Plaintiff SKAT.  In truth, McGee was intent on sheltering his fraudulent proceeds, and surreptitiously worked to shield the proceeds of his fraud on the Danish Government, the Belgian government, and AdaptHealth and become judgment proof to stymie SKAT's ability to enforce McGee's promise to pay back the net proceeds of his fraud.  In doing so, McGee utilized various Delaware limited liability companies, and established the 470 Trust as a vehicle to take advantage of Florida's homestead exemption and purchase an approximately $30 million home in Palm Beach, Florida with his ill-gotten gains.  In commencing this action, SKAT seeks, among other things, to avoid this fraudulent transfer to the 470 Trust.

3.      McGee defrauded Plaintiff SKAT, the agency of the government of Denmark charged with the assessment and collection of Danish taxes of approximately $580 million. Between 2012 and 2015, McGee conspired with non-parties Matthew Stein ("Stein"), Jerome Lhote ("Lhote") and others, to use some 80 sham pension plans that submitted fake dividend credit advices to deceive SKAT into "refunding" supposedly withheld dividend tax that was never suffered, on dividends that the plans never received, on shares that the plans never owned. In 2021, Danish criminal prosecutors indicted McGee, Stein and Lhote, for defrauding SKAT. All three face trial in Denmark in 2024.

4.      To avoid detection, McGee and his co-conspirators spread approximately 1,300 individual refund applications across approximately 80 sham pension plans they set up expressly for this purpose.  To cover their tracks, the plans purportedly engaged in a complicated series of transactions around various Danish public companies' dividend dates designed to create the appearance that the pension plans owned large quantities of Danish stock, from which they received dividends net of withholding tax – but in fact the trades were completely fake.  The purported trades were merely circular, paper transactions that involved no delivery or actual

ownership of any Danish shares.  This brazen fraud was at its heart very simple: the plans (which had no shares and no money to buy the shares) purported to buy shares from sellers who purportedly obtained the shares by borrowing them from the plans (which, again, had no shares to start with).  This game of smoke and mirrors generated a confirmation record from regulated, but crooked, financial institutions that were intended to, and did, deceive SKAT into believing that the plans were real, held real shares, received real dividends, and actually suffered Danish tax that they were entitled to have refunded.

5.      McGee's fraud on the Danish government played out in two phases.  The first phase took place from 2012 to 2014, when McGee, Stein and Lhote conspired with Sanjay Shah ("Shah") and others to have Shah's Solo Capital Partners ("Solo Capital"), a brokerage business based in London, facilitate the fake trading scheme.  Solo Capital purported to act as a legitimate custodial financial institution, and issued fake "dividend credit advices" to McGee, Stein and Lhote's sham plans, which were used to deceive SKAT into paying withholding tax reclaim applications on the dividends that the plans never received on shares that the plans never owned. Using Solo Capital, McGee, along with Stein and Lhote, bilked SKAT for approximately $185 million dollars in this phase.

6.      In phase two of the fraud, McGee, Stein and Lhote severed their relationship with Shah and Solo Capital and set up a breakaway fraud scheme using their own privately held German bank, North Channel Bank, as well as two other broker-custodians.  Cutting out Solo Capital permitted McGee, Stein and Lhote to keep a much larger percentage of the fraudulently obtained refunds.  In 2014 and 2015, McGee, Stein and Lhote, defrauded SKAT of a further approximately $395 million.

7.      In 2015, the Danish criminal prosecution service, SØIK, commenced investigations of Shah and Solo Capital, McGee, Stein, Lhote and North Channel Bank, among others.  In September 2019, North Channel Bank pleaded guilty in a Danish criminal court to a charge of serious criminal fraud in connection with the breakaway fraud scheme.  The United Kingdom's Financial Conduct Authority has fined a number of brokers for executing transactions that facilitated the fraud.

8.      By 2017, it was clear to McGee that SKAT was intent on pursuing claims against him for the massive fraud he and others perpetrated against SKAT.  McGee and his co-conspirators entered a tolling agreement with SKAT and attempted to negotiate a settlement of SKAT's potential claims against them.  Ultimately those negotiations resulted in a May 28, 2019 settlement agreement with Stein, Lhote, McGee, and others to resolve SKAT's claims against them arising from the pension plans' fraudulent tax refund applications (the "Settlement Agreement").  Under the Settlement Agreement, McGee, along with Stein, Lhote, and others, agreed jointly and severally to pay a preliminary settlement amount to SKAT of approximately $225 million – an estimate of the Net Proceeds the settling parties received, directly or indirectly, from SKAT's payment of their fraudulent refund applications – subject to increase if the Net Proceeds were in fact more than that amount.  McGee, Stein, Lhote, and the other settling parties were obligated (and did) pay approximately $138 million of the preliminary settlement amount. However, McGee, Stein, and Lhote were obligated to pay by May 28, 2023 the remaining unpaid preliminary settlement amount, which with certain interest and an adjustment to count the true value of the Net Proceeds, amounts to approximately $166 million.

9.      In March 2023, Stein and Lhote commenced an action in the United States District Court for the Southern District of New York (the "SDNY Action") seeking, among other

things, to avoid their obligation under the Settlement Agreement.  SKAT filed counterclaims against Stein and Lhote in the SDNY Action and impleaded McGee, asserting multiple breach of contract claims and seeking the approximately $166 million owed under the Settlement Agreement as a result of Stein, Lhote, and McGee's breach.  McGee sought to evade his obligation to SKAT under the Settlement Agreement by joining the motion to dismiss SKAT's counterclaims Stein and Lhote filed in the SDNY Action, which motion was denied.

10.     It is now clear that, since at least 2021, McGee has been fraudulently transferring the proceeds of his frauds to keep them beyond the reach of SKAT.

11.     Between 2012 and 2015, while perpetrating a massive fraud on SKAT, McGee and others participated in a similar scheme to submit fraudulent tax refund claims to Belgium's Federal Public Service Finance ("FPSF"), the agency of the Belgian government charged with the assessment and collection of Belgian taxes.  McGee's fraud on FPSF was nearly identical to his fraud on SKAT, in which McGee and others took advantage of a Belgian double tax treaty with the United States by using the same sham U.S. pension funds in order to submit to FPSF fraudulent documentation falsely representing that they owned shares in and received dividends from Belgian companies to collect purportedly withheld dividend taxes.  As a result of the scheme, McGee and others defrauded FPSF of approximately $13.3 million.

12.     After McGee's fraud schemes in Denmark and Belgium were shut down, McGee participated in yet another fraud, this time a securities fraud on the shareholders of publicly traded AdaptHealth, of which McGee was CEO.  The essence of the fraud on AdaptHealth shareholders was simple – while touting McGee's central importance to the future success of AdaptHealth, McGee and others failed to disclose the Danish government's civil and criminal investigations into McGee for his massive fraud on SKAT, and for good measure also

misrepresented to shareholders AdaptHealth's financial performance.  This fraud caused AdaptHealth share prices to artificially increase, which presented McGee an opportunity to sell many of his AdaptHealth shares at an artificially inflated price.

13.     Much like the fraud on the Danish and Belgian governments, the house of cards that was the fraud on AdaptHealth shareholders eventually collapsed.  Investors learned of McGee's involvement in the Danish fraud when he was belatedly removed as co-CEO, and subsequently learned that McGee and others had misrepresented AdaptHealth's financial growth figures.  The uncovering of the fraud caused the AdaptHealth stock price to plummet to the detriment of AdaptHealth shareholders.

14.     In his effort to fraudulently transfer the various proceeds of fraud to keep them beyond the reach of SKAT, McGee established the 470 South Ocean Boulevard Trust as a vehicle to transfer McGee's ill-gotten assets into real estate in an attempt to take improper advantage of Florida homestead protections against judgment creditors.  On September 4, 2021, the 470 Trust purchased an 8,804-square foot townhouse located at 470 S. Ocean Boulevard in Palm Beach, Florida (the "Palm Beach Mansion") for approximately $29.6 million.

15.     McGee's direct or indirect transfer of funds – gained from McGee's massive frauds – into the 470 Trust and then into the Palm Beach Mansion was done to prevent SKAT from obtaining funds owed by McGee under the Settlement Agreement.

16.     McGee cannot be permitted to shelter his ill-gotten gains from SKAT.  SKAT brings this action to, among other things, avoid McGee's transfer of approximately $30 million to the 470 Trust to purchase the Palm Beach Mansion, to impose an equitable lien on the Palm Beach Mansion, and to enjoin further disposition by both McGee and the 470 Trust of the

approximately $30 million transferred to the 470 Trust and the Palm Beach Mansion, and any of the proceeds of fraud McGee perpetrated on SKAT.

17.     SKAT has reason to believe that the fraudulent transfer to the 470 Trust is not the only measure McGee has taken to make himself judgment proof, and respectfully requests the Court order McGee to provide an accounting of his proceeds from the fraud he perpetrated upon SKAT.  Following judgment in the SDNY Action, SKAT will request that the Court order that SKAT may levy execution on the approximately $30 million transferred to the 470 Trust and the Palm Beach Mansion.

## PARTIES

18.     Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes.  SKAT is located at Hannemanns Allé 25, DK.2300 Copenhagen, Denmark.

19.     Defendant Luke McGee is a citizen of the United States and a citizen of Florida.

20.     Defendant 470 South Ocean Boulevard Trust is a trust which, upon information and belief, was formed on September 3, 2021 under Florida law.  On September 4, 2021, the 470 Trust purchased an 8,804-square foot townhouse located at 470 S. Ocean Boulevard in Palm Beach, Florida for approximately $29.6 million.  Upon information and belief, McGee is a beneficiary of the 470 Trust.

21.     Defendant Jonathan E. Gopman is the trustee of the 470 Trust.  Gopman is a partner at the law firm Nelson Mullins LLP and specializes in private wealth services, including asset protection structures.  Upon information and belief, Gopman is a citizen of the United States and a citizen of Florida.

22.     Defendants John Does 1 through 100 are individuals or entities not yet known to SKAT to whom McGee fraudulently transferred assets.

## JURISDICTION

23.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest or costs, and it is between an agency or instrumentality of a foreign state, as plaintiff, and citizens of a U.S. state, as defendants.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

**McGee participated in a massive fraud on SKAT.**

25.     Over the course of 2012 to 2015, McGee participated in a massive fraud to deceive SKAT into paying approximately 4 billion Danish Kroner, approximately $580 million (US), in purported refunds of tax that was supposedly withheld at source from dividends that Danish companies issued their shareholders, but, which, in fact, was never withheld or owed in the first place (the "Danish Fraud").

**i.     Overview of Danish Dividend Withholding Taxes and Refunds**

26.     In the context of this case, dividend withholding tax is the deducting of taxes by a Danish company from a dividend payment due to a recipient prior to the payment of the dividend.  The dividend withholding tax that is deducted by the Danish company is then transferred to SKAT, the Danish tax authority.  Under the Danish Withholding Tax Act section

65, during the relevant period Danish companies were required to withhold 27% of the dividend they distributed on their shares to certain shareholders, including foreign shareholders.

27.      Shareholders resident outside Denmark may be entitled to a refund if the withheld tax exceeds the amount of tax owed according to a double taxation treaty between Denmark and the shareholder's country of residence.  A double taxation treaty between Denmark and the United States (the "Treaty") allows for a full refund of tax withheld on dividends paid by Danish companies to qualified U.S. pension plans, which are exempt from taxation.  In order to qualify for a full refund under the Treaty, a U.S. pension plan must have owned the shares for which the dividend is issued, have received the dividend, have suffered tax on the dividend, and must possess tax-qualified status under section 401(a) of the Internal Revenue Code.

28.      In order to receive a dividend refund, a U.S. pension plan was required to submit an application to SKAT representing that they owned the relevant Danish shares, received the relevant dividend on the shares, suffered dividend tax on account of that dividend, and were otherwise entitled to a refund.  A central requirement of the application was that a U.S. Pension Plan was required to submit a "dividend credit advice" from its broker-custodian representing that the pension plan held Danish shares, had received dividends on those shares, and had suffered tax on those dividends.  Additionally, a U.S. pension plan was also required to submit, among other things, documentation from the Internal Revenue Service representing that they were qualified pension plans under the internal revenue code.

### ii.      The Danish Refund Fraud

29.      Beginning in 2012, McGee, along with non-parties Stein and Lhote, and others participated in a fraudulent scheme to deceive SKAT into paying dividend tax refunds to sham

U.S. pension plans that never held any Danish securities, received any dividends, or suffered any dividend withholding taxes.

30.     As part of the scheme, McGee, Stein, and/or Lhote created or caused others to create approximately 80 sham U.S. pension plans that submitted fraudulent dividend withholding tax refund applications to SKAT.  The sham plans, acting through payment agents, provided SKAT with the following documentation:

    a.    a short cover letter addressed to SKAT in Taastrup, Denmark;

    b.    a "Claim to Relief from Danish Dividend Tax" form, which set out:

        i.    the identity of the U.S. pension plan representing that it owed the relevant shares and had received dividends net of withholding tax;

        ii.    the amount of the tax refund application;

        iii.    a certification that the U.S. pension plan was covered by the U.S. double taxation treaty with Denmark; and

        iv.    the bank account to which SKAT should pay the refund application;

    c.    a "credit advice" note or similar document purporting to describe the shareholding (or security), the amount of dividend purportedly received, and the amount of dividend tax withheld;

    d.    a statement from the Internal Revenue Service on Form 6166, certifying that each U.S. pension plan was (i) a trust forming part of a pension, profit sharing, or stock bonus qualified under section 401(a) of the Internal Revenue Code, (ii) exempt from U.S. taxation under section 401(a), and (iii) a resident in the United States for purposes of United States taxation.

31.     Each of these documents contained representations and/or incorrect information that the conspirators knew or should have known were false and were intended to deceive SKAT into making a refund payment.  Specifically, the refund applications represented falsely that the pension plans owned Danish shares, on which the plans had received dividends, net of withholding tax, and that the plans were entitled to full refunds of the supposedly withheld tax under the Treaty.  In truth, the plans were not qualified U.S. pension plans for purposes of the Treaty, never owned the shares they claimed to own, never received any dividends from Danish companies in which they purported to be shareholders, never suffered any dividend withholding tax, and were not entitled to claim a refund of dividend withholding tax.  As a result of these false representations, SKAT paid refunds by bank transfer to the payment agents for the benefit of the plans.

32.     McGee conspired with others to cause 80 pension plans to submit approximately 1,300 fraudulent reclaims to SKAT.  These plans collectively defrauded SKAT of approximately DKK 4 billion (approximately $580 million).  Upon information and belief, McGee personally received approximately DKK 313 million (approximately $46 million USD) from the fraudulent scheme.

### iii.    McGee initially used Solo Capital Partners to facilitate the fraud

33.     The foundation of McGee and his co-conspirators' fraudulent refund scheme was the use of fraudulent dividend credit advices that would include false statements of Danish share holdings, dividends and suffered taxes.  These fraudulent dividend credit advices served as the basis of fraudulent refund applications that would be submitted to deceive SKAT into making refund payments to the sham pension plans that McGee and his co-conspirators had established.

34.     During the period from 2012 to 2014, McGee, Stein and Lhote entered into a conspiracy with Solo Capital, a U.K. entity at the time owned and controlled by Shah, through which Solo Capital would provide fraudulent dividend credit advices in exchange for a portion of the wrongfully obtained refund payment from SKAT.  During this time period, Solo Capital purported to serve as the custodian for 24 sham pension plans that McGee, Stein and/or Lhote created for the purpose of submitting their fraudulent tax refund applications to SKAT (three of which McGee was the sole participant in), and Solo Capital issued the false dividend credit advices that the plans included in their tax refund applications, despite the fact that neither the pension plans nor Solo Capital ever held any Danish shares, received any dividends, or suffered any withholding tax.

35.     In order to avoid detection and to perpetuate the fraudulent scheme, McGee and his conspirators, in coordination with Solo Capital, concocted a series of circular fake paper trades that would generate false documentation but never resulted in either the U.S. pension plans or Solo Capital ever having any Danish shares, receiving any dividends or paying any taxes.  As part of these obfuscation efforts, the pension plans first opened securities trading accounts at Solo Capital funded with little or no capital.

36.     After a Danish company announced it would pay a dividend to its shareholders, the plans purportedly purchased large amounts of shares in the Danish company from a broker identified by Solo Capital in an over-the-counter trade.  Solo Capital did not require the pension plans to pay any money to buy these alleged shares, nor could they as the pension plans had minimal, if any, actual capital.  In reality, no shares were ever actually purchased for the pension plans.  Instead, Solo Capital created a series of circular, paper transactions laundered through third party brokers that featured no delivery of Danish shares and no payment of cash to acquire

shares: the plans (which had no shares and no money to buy the shares) purported to buy shares from sellers who, in turn, purportedly obtained the shares by borrowing them from the plans (which, again, had no shares to start with).  Based on the transactions in this looping shell game, Solo Capital issued the plans dividend credit advices stating that (i) the pension plans owned Danish shares, even though no Danish shares were ever received or held, (ii) the pension plans received dividends, even though no actual cash payments were ever received from a Danish company, and (iii) the pension plan suffered withholding tax on dividends, even though they never actually received a dividend, much less a dividend net of withholding tax.  After SKAT paid the money requested in the tax refund applications to the pension plans, the money was then distributed to other participants in the scheme through a series of transactions, involving in some circumstances multiple intermediaries.  The attempt to obscure the ultimate beneficiaries of the refund payment further demonstrates McGee and the other co-conspirators' fraudulent intent in perpetuating the fraudulent refund scheme.

37.     The United Kingdom Financial Conduct Authority ("FCA"), which regulated Solo Capital and other participants in the fraud, investigated the "trading" and to date has fined four of the brokers through which the "trading" was allegedly conducted.  One such broker was Bastion Capital London LTD ("Bastion").  The FCA fined Bastion GBP 2.5 million for its role in facilitating the fraud, and concluded:

> [T]he purported trading was a "circular pattern of extremely high value . . . equity trading, back-to-back securities lending arrangements and forward transactions," the purpose of which was to generate the false custodian statements that the plans submitted to SKAT.
>
> . . .
>
> The [FCA] refers to the trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by

the Solo Group.  This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime.[1]

38.     SKAT filed civil cases in Dubai and England against Shah, Solo Capital, and other entities owned or controlled by Shah.  SKAT obtained a civil judgment against Shah in Dubai in the amount of approximately $1.25 billion.  SKAT's civil trial against Shah and others in England began in April and is continuing.  In his civil testimony, Shah has confirmed that Solo Capital's "trading" in Danish shares was a closed loop, and that Solo Capital in fact never held any Danish shares.

39.     Danish prosecutors brought criminal charges against Shah, as they have done against McGee, Stein and Lhote.  Shah was extradited to Denmark for his criminal trial, which commenced in 2024.

40.     Danish prosecutors likewise brought criminal charges against Shah's right-hand man, Anthony Patterson.  Patterson pleaded guilty and admitted that the Solo Capital scheme was a complete fraud.

### iv.     McGee and his co-conspirators move the fraud from Solo Capital Partners to their own North Channel Bank

41.     McGee, Stein, and Lhote later split from Shah and joined a breakaway fraud scheme along with certain former employees and associates of Shah, including Graham Horn ("Horn"), a former Solo Capital employee and key player in the breakaway fraud.  This fraudulent scheme followed the circular trading structure of the previous fraud conducted through Solo Capital, with the relevant distinction that a portion of the dividend credit advices

---

1.   https://www.fca.org.uk/publication/final-notices/bastion-capital-london-ltd-2023.pdf.  To date, three other brokers have also been fined by the FCA and subject to similar criticism for their roles in facilitating the fraud on SKAT.  *See* https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf; https://www.fca.org.uk/publication/final-notices/the-tjm-partnership-limited-formerly-known-as-neovision-global-capital-limited-in-liquidation-2022.pdf; https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf.

would be issued by North Channel Bank, the institution owned by McGee and his co-conspirators.

42.     Since at least 2013, McGee, Stein, and Lhote have owned, through entities they controlled, a controlling interest in a German bank called North Channel Bank.  As of 2018, McGee, Stein, and Lhote owned more than 93 percent of North Channel Bank.

43.     As part of the breakaway fraud scheme, McGee, along with Stein, and Lhote, developed a custody business at North Channel Bank to enable North Channel Bank to serve as purported custodian for sham pension plans.  McGee, Stein, and Lhote then created new sham U.S. pension plans that would submit fraudulent tax refund applications to SKAT.  North Channel Bank, along with two other new broker-custodians, served as a purported custodian of Danish shares for 56 new plans and issued the false dividend credit advices that the plans included in their tax refund applications to confirm falsely their fake trades and purported ownership of Danish shares.  In truth, as with Solo Capital, North Channel Bank and other broker-custodians never held any shares on behalf of the 56 new plans as described in the credit advices and did not receive any dividends on those shares.

44.     The North Channel Bank chapter of the fraud followed the Solo Capital model closely.  During the setup of the fraud at North Channel Bank, North Channel Bank management raised questions to McGee, Stein, Lhote and others about the purported stock transactions.  The responses, on which McGee, Stein, and Lhote were copied, make clear that the scheme was designed as a complete fraud from the start, because neither North Channel Bank nor any party to the trades was ever going to hold any shares or receive any dividends (or even any cash payments, other than the payment from SKAT).  Yet, North Channel Bank nevertheless issued false dividend credit advices purporting to confirm that pension plans owned shares and received

dividends, net of withholding tax.  As with the Solo Capital chapter of the fraud, the North Channel Bank dividend credit advices were created in order to, and did, deceive SKAT into believing that the sham pension plans were entitled to a refund of withheld dividend tax.

45.     McGee had a lead role in setting up the custody business at North Channel Bank and knew that North Channel Bank "trading" was nothing more than a series of false book entries designed to deceive SKAT into believing that the pension plans owned shares and suffered tax on dividends on those shares, when in fact the parties to the "trading" never owned the shares they claimed to have owned, nor had the cash to purchase or borrow those shares, nor ever received any dividends.  Just as in the Solo Capital fraud, the circular "trading" at North Channel Bank was nothing more than a loop in which the "seller" purported to sell shares it didn't own to a pension plan and covered the supposed short sale by borrowing from the pension plan the very shares it was allegedly selling it.  In short, McGee knew that the scheme was a complete and utter fraud.

46.     After the intervention of BaFin, the German Federal Financial Supervisory Authority, North Channel Bank fired the management of the bank that was in place from 2013 through 2016.  North Channel Bank's new management testified in 2021 that the bank had reviewed its records, including the Danish dividend credit advices, and determined that North Channel Bank held no Danish shares for any of the plans, received no dividends, and that the dividend credit advices were "fictitious."  North Channel Bank now admits that the credit advices were fraudulently produced to show amounts deducted from the gross dividend as a withholding tax to be presented to SKAT and reclaim taxes that were never paid.  North Channel Bank also confirmed under oath that McGee – along with Stein and Lhote – were "deeply

involved" in the set-up of the whole scheme, including introducing all the pension plans to North Channel Bank.

47.     On September 23, 2019, North Channel Bank pleaded guilty in a Danish criminal court to a charge of serious criminal fraud in connection with the breakaway fraud scheme.  In its plea, North Channel Bank admitted that it had received DKK 55 million from the refunds paid by SKAT and was ordered to pay a fine of DKK 110 million.

48.      On or around April 13, 2021, Danish prosecutors indicted McGee, along with Stein and Lhote, for his role in defrauding SKAT of approximately $580 million.  Upon information and belief, McGee, along with Stein and Lhote, will face trial in Denmark in 2025.

**McGee and others enter into a settlement agreement with SKAT.**

49.     On May 28, 2019, Stein, Lhote, McGee and others recruited by them to participate in the scheme entered into the Settlement Agreement with SKAT to resolve SKAT's claims against them arising from the pension plans' fraudulent tax refund applications.

50.     Under the Settlement Agreement, McGee, along with Stein and Lhote, agreed jointly and severally to pay to SKAT the Net Proceeds (as defined in the Settlement Agreement) they received, directly or indirectly, from SKAT's payment of their fraudulent refund applications.

51.     As an estimate of the Net Proceeds, the Settlement Agreement established a preliminary settlement amount to be paid to SKAT of DKK 1.55 billion, subject to increase if the Net Proceeds were in fact more than that amount.  Under the Settlement Agreement, McGee, Stein, Lhote, and the other settling parties were obligated to (and did) pay DKK 950 million of the preliminary settlement amount within a few months of its effective date.

52.     McGee, Stein, and Lhote were obligated under the Settlement Agreement, as modified by a contemporaneously executed side letter, to pay the remaining DKK 600 million of the preliminary settlement amount no later than May 28, 2023.  Further, in the event any part of the DKK 600 million remained unpaid 24 months after the effective date, *i.e.*, on May 28, 2021, the Settlement Agreement entitles SKAT to 8.05 percent interest on the remaining unpaid amount starting from that date.  McGee, Stein, and Lhote were obligated to pay all such accrued interest, along with the remaining unpaid portion of the DKK 600 million, by May 28, 2023.  Additionally, based on a "True-Up" process – a means of establishing the actual amount of the Net Proceeds – set forth in the Settlement Agreement, McGee, Stein, and Lhote were obligated to pay SKAT the True Up amount of DKK 108,603,074, and interest thereon, no later than May 28, 2023.

53.     The Net Proceeds that McGee, along with Stein and Lhote, are obliged to repay to SKAT under the Settlement Agreement are DKK 648,177,440, plus applicable interest.

54.     To date, McGee, along with Stein and Lhote, have paid SKAT only DKK 60,425,634 of the DKK 600 million balance of the preliminary settlement amount, and none of the True-Up amount or any accrued interest.

**McGee participated in a nearly identical fraud against the Belgian government.**

55.     While perpetrating a massive fraud on SKAT, from 2012 through 2015, McGee and others also participated in a nearly identical scheme to submit fraudulent tax refund claims to Belgium's FPSF, the agency of the Belgian government charged with the assessment and collection of Belgian taxes.  Belgium, like Denmark, taxes dividends paid by Belgian companies. At the time each dividend is paid, the Belgian company withholds 25% and transfers that amount to FPSF.  Under a tax treaty between the United States and Belgium, tax-exempt residents of the

United States, including pension plans, are entitled to refunds of any withholding tax on dividends. To obtain a refund, a pension plan must submit an application to FPSF with proof of its tax-exempt status and its ownership of a dividend payment that resulted in withholding.

56.     Just as with the Danish Fraud, the Belgian scheme involved the same sham pension plans which represented to FPSF that they were tax-exempt pension plans and, using misleading documentation, represented that they owned shares in and received dividends from Belgian companies, thereby justifying payment from FPSF of amounts supposedly withheld as dividend taxes.  And much like the Danish Fraud, McGee and others – reaping the benefits of their fraud – collected the refunds made by the FPSF for the purported withheld dividend taxes. As a result of the scheme, McGee and others defrauded FPSF of approximately $13.3 million.

**McGee's securities fraud on shareholders of AdaptHealth Corp.**

57.     While perpetrating the reclaim frauds on SKAT and the Belgian government, McGee became the CEO, and later co-CEO, of AdaptHealth, a home medical equipment business, until being removed from the position in June 2021.  In his capacity as CEO and co-CEO, McGee participated in a securities fraud on AdaptHealth shareholders by failing to disclose the Danish government's civil and criminal investigations into McGee for his massive fraud on SKAT and by misrepresenting to investors AdaptHealth's financial performance, specifically its "organic revenue growth" (the "AdaptHealth Fraud").  McGee's fraudulent actions caused AdaptHealth share prices to artificially increase, allowing McGee to sell many of his AdaptHealth shares at an artificially inflated price.  On July 29, 2021, a class action was filed in the United States District Court for the Eastern District of Pennsylvania against McGee, AdaptHealth, and other officers and directors of AdaptHealth, pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77a, *et. seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et.*

*seq. See Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, No. 21-3382, ECF No. 1 (E.D. Pa. July 29, 2021) (the "Securities Action").[2]  The defendants in the Securities Action – including McGee – moved to dismiss the amended complaint, which motion was denied in its entirety.  *See AdaptHealth Corp.*, No. 21-3382, ECF No. 51 (E.D. Pa. June 9, 2022).

58.     On July 8, 2019, DFB Acquisitions Corp. ("DFB"), a special purpose acquisition company, or SPAC, announced that it had entered into an agreement to merge with AdaptHealth. Prior to DFB's merger with AdaptHealth, McGee owned equity in AdaptHealth which, at the time, was a private company.  On November 8, 2019, following its merger with DFB, AdaptHealth began publicly trading.  In connection with DFB's merger with AdaptHealth, McGee's pre-existing shares in AdaptHealth were converted and DFB granted McGee approximately 670,830 Class A AdaptHealth shares, 224,121 warrants to acquire Class A AdaptHealth shares at $11.50 per share, and 4,626,028 Class B AdaptHealth shares.

59.     Prior to its merger with DFB, AdaptHealth, under McGee, acquired at least 59 businesses between 2012 and 2019 and increased revenue 200% in the three years preceding the DFB merger, which it accomplished through a combination of "organic revenue growth" – *i.e.*, revenue from AdaptHealth's existing, rather than recently acquired, businesses – and growth in revenue from companies that AdaptHealth had recently acquired.  McGee was praised for building "one of the industry's leading [home medical equipment] providers through a combination of accretive capital deployment, high-touch customer engagement, and scalable, purpose-built, technology-enabled operating model."  In connection with the DFB merger,

---

2.   Although the Securities Action remains pending, the parties to that action have reached a settlement agreement, which the court has preliminarily approved.  *See AdaptHealth Corp.*, No. 21-3382, Order Preliminarily Approving Settlement and Providing for Notice, ECF No. 153 (E.D. Pa. Mar. 5, 2024).  The court held a hearing for final settlement approval on June 20, 2024.

AdaptHealth and McGee told investors that "[w]e have a target of doing $100 million in revenue acquired" but emphasized that "we all know that organic growth is more valuable, and we strive to make sure we're accomplishing that." After merging with DFB, AdaptHealth each quarter reported strong growth in organic revenue growth and acquired business revenue growth, and projected continued organic revenue growth of 6-8%, well above its industry peers. At every turn, AdaptHealth credited its management – McGee in particular – for the company's success. For example, on its Forms 10-Q filed with the Securities Exchange Commission ("SEC") throughout 2020, AdaptHealth stated that its "ability to successfully operate our business is largely dependent upon the efforts of certain personnel of AdaptHealth, including [McGee], who have stayed with us following the business combination. The loss of such key personnel would negatively impact our operations and financial results."

60. AdaptHealth and McGee failed to disclose a fact that jeopardized both components of AdaptHealth's ability to grow and withheld from investors information important to the valuation of AdaptHealth – McGee's involvement in the massive fraud on SKAT and the Danish government's resulting civil and criminal investigations. Just as McGee was steering AdaptHealth's merger with DFB and selling investors on his ability to continue leading AdaptHealth to success, McGee was facing potential civil and criminal exposure for his role in the Danish Fraud, and NCB, the bank he owned with his co-conspirators and used to perpetrate the fraud, was facing imminent criminal liability. After several years of negotiations, McGee entered into the Settlement Agreement with SKAT on May 28, 2019, agreeing to pay SKAT at least DKK 1.55 billion; on September 23, 2019, North Channel Bank pleaded guilty to criminal offense in Denmark and a Danish criminal court ordered North Channel Bank to pay a criminal fine of DKK 110 million. McGee was aware of his fraud on SKAT, and, upon information and

belief, of SØIK's criminal investigation into the fraud. Yet, despite SEC regulations requiring disclosure to investors, McGee and AdaptHealth failed to disclose McGee's massive fraud on Denmark and the investigations by SKAT and SØIK.

61.     With pressure from SØIK's criminal investigation bearing down on McGee, AdaptHealth's growth strategy suffered. Unbeknownst to investors, new acquisitions were in jeopardy and organic growth dried up by late 2020 as AdaptHealth struggled to integrate the large influx of new businesses that McGee was responsible for acquiring. In the process of acquiring its biggest acquisition yet, AeroCare, AdaptHealth's board of directors created what analysts described as a "slightly unusual" co-CEO arrangement between AeroCare's CEO and McGee, which took effect on February 1, 2021, following AdaptHealth's acquisition of AeroCare. Soon after, the reason for the "slightly unusual" arrangement began to surface as, a mere eight weeks later, AdaptHealth put McGee on unpaid leave after announcing that McGee had been criminally charged by Danish authorities.

62.     After going public, AdaptHealth initially provided an organic revenue growth metric that was standard within the company's industry and throughout corporate finance, in which revenue growth from recent acquisitions is specifically excluded from the calculation. For example, AdaptHealth consistently differentiated "internal" organic revenue growth from "external" inorganic revenue growth attributable to recent acquisitions. However, knowing that AdaptHealth's organic growth had dried up by late 2020 and that slowing growth is the death knell of an emerging growth company, McGee and others covered up that AdaptHealth's organic growth had stalled in late 2020. Without disclosing what they were doing, McGee and others deliberately changed the definition of the organic revenue growth metric that they disclosed to investors on the company's quarterly earnings calls. Unbeknownst to investors, McGee and

others replaced the "organic" revenue growth metric AdaptHealth had used since its inception to

a new "pro forma" calculation that was inflated by incorporating revenue tied to AdaptHealth's

recent acquisitions. In truth, McGee and others were relying almost entirely on an unsustainable

pace of new acquisitions to boost reported "organic" revenue growth. If the truth about the

stalling of organic revenues was revealed, investors would call into question AdaptHealth's long-

term revenue growth story. Instead of the definition that AdaptHealth – and every other publicly

traded company – had historically used, McGee and others misleadingly characterized this new

metric as "organic revenue" and reported revenue growth of 6% for the fourth quarter of 2020,

and 11% for the first quarter of 2021, and told investors to expect organic revenue growth of 8-

10% going forward.

63.     McGee's fraud on AdaptHealth investors unraveled on April 13, 2021. That day,

AdaptHealth announced that it had put McGee on unpaid leave from his role as co-CEO of

AdaptHealth after claiming that it had "learned that authorities in Denmark have formally

charged [him] with alleged tax fraud arising from certain past private activity." AdaptHealth's

stock dropped approximately 20% on this news as analysts noted the loss of a "visionary"

responsible for AdaptHealth's growth success. The stock dropped significantly even though

AdaptHealth's release emphasized that "[t]he alleged personal conduct occurred between March

2014 and August 2015 and had no connection to AdaptHealth's business." On July 19, 2021, it

came to light that AdaptHealth's true organic revenue growth, when calculated in line with the

company's prior disclosures and industry standards, was actually negative for the first six months

of 2021.

64.     Plaintiffs in the Securities Action allege that they acquired shares of AdaptHealth

at artificially inflated prices due to AdaptHealth and McGee's failure to disclose McGee's

involvement in the Danish Fraud and material misrepresentations about AdaptHealth's organic growth revenue reporting. The proposed class period for the Securities Action is between November 8, 2019 and July 16, 2021.

65.     Between 2018 and 2021, McGee received numerous forms of equity and equity derivatives in AdaptHealth: Class A shares, Class B shares, warrants to acquire Class A shares, and Class A share options. During this time, AdaptHealth granted McGee approximately 670,830 Class A shares; 4,626,028 Class B shares; 224,121 warrants to acquire Class A shares; and 1,250,000 Class A share options. McGee held the majority of his AdaptHealth equity in his array of limited liability companies: 2321 Capital LLC ("2321 Capital"), which McGee wholly owns and controls; Fresh Pond Investment LLC ("Fresh Pond"), which, upon information and belief, McGee wholly owns and controls, and LBM DME Holdings LLC ("LBM" and, together with 2321 Capital and Fresh Pond, the "McGee LLCs"), which, upon information and belief, McGee wholly owns and controls. Upon information and belief, McGee exercises exclusive domination and control over the McGee LLCs to the point that the McGee LLCs no longer have legal or independent significance of their own. Upon information and belief, the McGee LLCs are a sham and exist for no other purpose than as vehicles for the proceeds of McGee's multiple frauds. For example, 2321 Capital, in addition to holding McGee's equity in AdaptHealth, sponsored a pension plan that made fraudulent reclaims in the Danish Fraud.

66.     Between 2018 and 2021, McGee exercised his rights under the warrants and options to obtain additional Class A shares in AdaptHealth. Moreover, on numerous occasions, McGee exchanged his Class B shares for Class A shares, which AdaptHealth either issued or paid cash in lieu of delivery. For example, as of December 9, 2020, McGee, through 2321 Capital, exchanged 1,424,171 Class B shares for Class A shares. Of those shares, AdaptHealth

elected to pay $29.36 per share in lieu of delivering 1,312,808 of such shares and issued the remaining 121,363 Class A shares.  In all, AdaptHealth paid McGee approximately $38 million in cash in lieu of delivering Class A shares for Class B shares.  Upon information and belief, AdaptHealth originally granted McGee the Class B shares at a price significantly less than $29.36 per share.  As a result, McGee was able to cash out on millions of dollars' worth of shares at prices artificially inflated from this fraud.  In addition, McGee, either directly or through the McGee LLCs, gifted hundreds of thousands of AdaptHealth shares to persons or entities unknown.

67.     Upon its merger with AdaptHealth, DFB granted McGee approximately 670,830 Class A AdaptHealth shares, 224,121 warrants to acquire Class A AdaptHealth shares at $11.50 per share, and 4,626,028 Class B AdaptHealth shares.  Upon information and belief, but for McGee's failure to disclose his involvement in the massive fraud on SKAT and the Danish government's resulting investigations, DFB would not have granted McGee such shares in AdaptHealth or, alternatively, if DFB would have granted McGee such shares in AdaptHealth, the share price of such shares would have been dramatically lower at the time of McGee's sale of the shares.

**McGee reneges on the SKAT Settlement Agreement.**

68.     Stein, Lhote, and McGee's obligation under the Settlement Agreement to pay SKAT DKK 648,177,440, plus accrued interest, was due on May 28, 2023.  On March 24, 2023, instead of meeting their obligation to SKAT, Stein and Lhote commenced the SDNY Action seeking, among other things, to avoid their obligation under the Settlement Agreement.  SKAT filed counterclaims against Stein and Lhote in the SDNY Action and impleaded McGee, asserting multiple breach of contract claims and seeking the over DKK 1,141,537,135 owed

under the Settlement Agreement as a result of Stein, Lhote, and McGee's breach.  McGee has

sought to evade his obligation to SKAT under the Settlement Agreement by, among other things,

joining the motion to dismiss SKAT's counterclaims Stein and Lhote filed in the SDNY Action.

69.     McGee's actions prior to commencement of the SDNY Action reveal that McGee

never intended to honor his obligation to SKAT under the Settlement Agreement.  Rather, in the

time leading to the SDNY Action, McGee took affirmative steps to shield his assets and become

judgment proof to stymie SKAT's ability to enforce the Settlement Agreement and any judgment

against him.  As part of those efforts, McGee established the 470 Trust as a vehicle to transfer his

ill-gotten assets into the Palm Beach Mansion, in an attempt to shield them from SKAT's reach.

70.     Upon information and belief, the 470 Trust, which was used to purchase the Palm

Beach Mansion, was funded with the proceeds of McGee's various fraudulent schemes,

including: (1) the proceeds from McGee's massive fraud on SKAT; (2) the proceeds from

McGee's fraud on Belgium; and/or (3) the proceeds of the sale of artificially inflated

AdaptHealth shares granted to McGee by AdaptHealth.  To facilitate the purchase of the Palm

Beach Mansion, McGee either directly funded the 470 Trust with these ill-gotten assets or did so

indirectly through the McGee LLCs.  Upon information and belief, McGee did not receive a

reasonably equivalent value in exchange for the transfer.

71.     After McGee, either directly or indirectly through the McGee LLCs, funded the

470 Trust with the spoils of his multiple frauds, the 470 Trust purchased the Palm Beach

Mansion – an 8,804-square foot townhouse located at 470 S. Ocean Boulevard in Palm Beach,

Florida – for approximately $29.6 million.

72.     Upon information and belief, the 470 Trust's purchase of the Palm Beach

Mansion was intended to take advantage of the Florida homestead exemption for McGee's

benefit.  Following the purchase of the Palm Beach Mansion, McGee obtained possession of the Palm Beach Mansion, used the Palm Beach Mansion as his address to register for several licenses, and personally paid property taxes for the Palm Beach Mansion in November 2021 and 2022.  McGee's wife, Gabrielle McGee, paid property taxes for the Palm Beach Mansion in December 2023.

73.     McGee's direct or indirect transfer of funds – gained from McGee's massive fraud on SKAT, the fraud on Belgium, and/or the fraud on AdaptHealth shareholders – into the 470 Trust and then into the Palm Beach Mansion was done to prevent SKAT from obtaining funds owed by McGee under the Settlement Agreement.

74.     Upon information and belief, McGee became insolvent as a result of the transfer of funds into the 470 Trust for the purchase of the Palm Beach Mansion, or was already insolvent at the time of the transfer.

75.     Upon information and belief, McGee has insufficient assets to satisfy his joint and several obligation to SKAT.

## CAUSES OF ACTION

## COUNT I

### (Actual Fraudulent Transfer – Fla. Stat. § 726.105(1)(a))
### (Against all Defendants)

76.     SKAT repeats and realleges paragraphs 1 through 75 above as if fully set forth herein.

77.     Based on McGee's obligations under the Settlement Agreement, as well as the pending SDNY Action, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

78.     McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion with the intent to hinder, delay, or defraud SKAT of funds owed to it pursuant to the Settlement Agreement.

79.     Upon information and belief, the approximately $30 million transferred to the 470 Trust constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.

80.     By transferring the $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust, McGee sought to conceal the transfer of his assets.

81.     After the 470 Trust's purchase of the Palm Beach Mansion, McGee obtained possession of the Palm Beach Mansion, using the Palm Beach Mansion address to register for several licenses, paying the property taxes for the Palm Beach Mansion in November 2021 and 2022, and having his wife, Gabrielle McGee, pay the property taxes in December 2023.

82.     Before McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion, McGee was threatened with suit by SKAT.

83.     Upon information and belief, McGee became insolvent as a result of the transfer of funds into the 470 Trust for the purchase of the Palm Beach Mansion, or was already insolvent at the time of the transfer.

84.     After transferring his assets into the Palm Beach Mansion through the 470 Trust, McGee failed to meet his obligation under the Settlement Agreement and joined Stein and Lhote in the SDNY Action seeking to dismiss SKAT's claims pursuant to the Settlement Agreement.

85.     As a result of the foregoing, McGee's transfer of approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion qualifies as an actual fraudulent transfer under Florida law.

## COUNT II

**(Constructive Fraudulent Transfer – Fla. Stat. § 726.105(1)(b)(1))**
**(Against all Defendants)**

86.     SKAT repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

87.     Based on McGee's obligations under the Settlement Agreement, as well as the pending SDNY Action, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

88.     McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion and, upon information and belief, did not receive a reasonably equivalent value in exchange for the transfer.

89.     Upon information and belief, the approximately $30 million transferred to the 470 Trust constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.

90.     By virtue of his obligations under the Settlement Agreement, McGee was engaged in a transaction for which McGee's remaining assets were unreasonably small in relation to his obligation under the Settlement Agreement when McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion.

91.     As a result of the foregoing, McGee's transfer of approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion qualifies as a constructive fraudulent transfer under Florida law.

**COUNT III**

**(Constructive Fraudulent Transfer – Fla. Stat. § 726.105(1)(b)(2))**
**(Against all Defendants)**

92.     SKAT repeats and realleges repeats and realleges paragraphs 1 through 91 above as if fully set forth herein.

93.     Based on McGee's obligations under the Settlement Agreement, as well as the pending SDNY Action, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

94.     McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion and, upon information and belief, did not receive a reasonably equivalent value in exchange for the transfer.

95.     Upon information and belief, the approximately $30 million transferred to the 470 Trust constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.

96.     By virtue of his obligation under the Settlement Agreement, McGee intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

97.     As a result of the foregoing, McGee's transfer of approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion qualifies as a constructive fraudulent transfer under Florida law.

**COUNT IV**

**(Constructive Fraudulent Transfer – Fla. Stat. § 726.106(1))**
**(Against all Defendants)**

98.     SKAT repeats and realleges paragraphs 1 through 97 above as if fully set forth herein.

99.     Based on McGee's obligations under the Settlement Agreement, as well as the pending SDNY Action, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

100.    McGee transferred approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion and upon information and belief, did not receive a reasonably equivalent value in exchange for the transfer.

101.    Upon information and belief, the approximately $30 million transferred to the 470 Trust constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.

102.    Upon information and belief, McGee's transfer of the $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion occurred when McGee was insolvent or rendered McGee insolvent.

103.    As a result of the foregoing, McGee's transfer of approximately $30 million directly, or indirectly from the McGee LLCs, to the 470 Trust to purchase the Palm Beach Mansion qualifies as a constructive fraudulent transfer under Florida law.

## COUNT V

### (Fraudulent Asset Conversion – Fla. Stat. § 222.30)
### (Against all Defendants)

104.    SKAT repeats and realleges paragraphs 1 through 103 above as if fully set forth herein.

105.    Based on McGee's obligations under the Settlement Agreement, as well as the pending SDNY Action, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

106.    McGee converted assets by converting approximately $30 million into the Palm Beach Mansion.

107.    Upon information and belief, the approximately $30 million McGee converted into the Palm Beach Mansion constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.

108.    McGee's conversion of assets caused the proceeds of those assets to become exempt from collection under Florida law by SKAT.[3]

109.    McGee made the conversion of assets with the intent to hinder, delay, or defraud SKAT of funds owed to it pursuant to the Settlement Agreement.

110.    As a result of the foregoing, McGee's conversion of approximately $30 million into the Palm Beach Mansion qualifies as a fraudulent asset conversion under Florida law.

## COUNT VI

### (Equitable Lien)
### (Against all Defendants)

111.    SKAT repeats and realleges paragraphs 1 through 110 above as if fully set forth herein.

112.    Upon information and belief, the approximately $30 million transferred to the 470 Trust constituted McGee's ill-gotten gains from the Danish Fraud, the fraud on Belgium, and/or the AdaptHealth Fraud.  McGee subsequently caused the 470 Trust to purchase the Palm Beach Mansion with those funds.

113.    Under such circumstances, general considerations of right and justice warrant the imposition of an equitable lien on the Palm Beach Mansion in favor of SKAT.

114.    As a result of the foregoing, SKAT is entitled to an equitable lien on the Palm Beach Mansion.

---

3.   SKAT pleads this cause of action in the alternative.

## COUNT VII

### (Unjust Enrichment)
### (Against all Defendants)

115.     SKAT repeats and realleges paragraphs 1 through 114 above as if fully set forth herein.

116.     SKAT is the rightful owner of proceeds of the Danish Fraud obtained by Defendants.

117.     By providing the proceeds of the Danish Fraud, SKAT conferred a benefit upon Defendants, which benefit Defendants appreciated, accepted, and retained.

118.     Upon information and belief, McGee caused the 470 Trust to purchase the Palm Beach Mansion with the proceeds from the Danish Fraud.

119.     Under such circumstances, it would be inequitable for Defendants to retain the proceeds of the Danish Fraud without paying the value thereof.

120.     By either directly or indirectly possessing the proceeds of the Danish Fraud, Defendants have been unjustly enriched.

121.     As a result of the foregoing, SKAT is entitled to a constructive trust over McGee's proceeds from the Danish Fraud.

### **REQUEST FOR RELIEF**

122.     WHEREFORE, Plaintiff SKAT requests that this Court enter judgment in its favor against Defendants as follows:

123.     For Counts I through V:

   a.   Avoidance of the transfer of approximately $30 million to the 470 Trust to purchase the Palm Beach Mansion;

   b.   Imposition of an equitable lien on the Palm Beach Mansion;

c.  An injunction against further disposition by both McGee and the 470 Trust of the approximately $30 million transferred to the 470 Trust and/or the Palm Beach Mansion;

d.  An injunction against further disposition by both McGee and the 470 Trust of any of the proceeds of (i) the Danish Fraud, (ii) the fraud on Belgium, and (iii) the AdaptHealth Fraud;

e.  Following judgment in the SDNY Action, a Court order levying execution on the approximately $30 million transferred to the 470 Trust and the Palm Beach Mansion;

f.  An accounting of the proceeds of (i) the Danish Fraud, (ii) the fraud on Belgium, and (iii) the AdaptHealth Fraud;

g.  The imposition of a constructive trust over McGee's proceeds from the Danish Fraud.

124.   For Count VI:

a.  Imposition of an equitable lien on the Palm Beach Mansion;

125.   For Count VII:

a.  The imposition of a constructive trust over McGee's proceeds from the Danish Fraud.

126.   The costs of this action.

127.   All other and further relief that is just and proper.

## **<u>JURY TRIAL DEMAND</u>**

Skatteforvaltningen demands a trial by jury on all issues so triable.

Dated: Miami Florida
     July 9, 2024

Respectfully submitted,

**KOBRE & KIM LLP**

By: /s/ Michael C. Fasano
Steven G. Kobre (*pro hac vice* forthcoming)
Josef M. Klazen (*pro hac vice* forthcoming)
Michael C. Fasano
Fla. Bar No. 98498
201 South Biscayne Blvd, Suite 1900
Miami, Florida 33131
305.967.6100 (t)
305.373.9443 (f)
steven.kobre@kobrekim.com
jef.klazen@kobrekim.com
michael.fasano@kobrekim.com

**HUGHES HUBBARD & REED LLP**

Marc A. Weinstein (*pro hac vice* forthcoming)
Neil J. Oxford (*pro hac vice* forthcoming)
Dustin P. Smith (*pro hac vice* forthcoming)
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (t)
(212) 422-4726 (f)
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com com

*Counsel for Plaintiff Skatteforvaltningen
(Customs and Tax Administration of the
Kingdom of Denmark)*